## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

SHAWN TYSON (1)
NATASHA NATILE FRANCE (2),

      Defendants.

CRIMINAL ACTION NO.

1:19-CR-103-TCB-JEM

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

This criminal case is before the Court on Defendant Shawn Tyson's four

motions: a motion to dismiss Counts Ten, Twelve, and Fourteen, (doc. 251); a

motion to sever Count Fifteen, (doc. 253); a motion to suppress evidence, (doc.

252); and an adopted motion to suppress evidence filed by Defendant Natasha

France, (doc. 285). Also before the Court is Defendant Natasha France's motion

to dismiss Counts Ten and Twelve, (doc. 266). For the reasons that follow, I

**RECOMMEND** that each of Tyson's four motions be **DENIED**. I **FURTHER**

**RECOMMEND** that France's motion be **DENIED**.

### PROCEDURAL BACKGROUND

On March 19, 2019, a federal grand jury sitting in the Northern District of

Georgia returned a 15-count indictment charging Tyson, France, and others with

conspiring to make false statements to a licensed firearms dealer, in violation of

18 U.S.C. § 371; making false statements to licensed firearms dealers, in violation

of 18 U.S.C. § 922(a)(6) and 2; and knowingly causing the United States Postal

Service to fail to file a required export declaration form by failing to declare that

1

they were exporting firearms and firearms parts, in violation of 13 U.S.C. § 305 (Doc. 1). The indictment also charges Tyson with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (*Id.*).

More specifically, count one —the conspiracy count — charges that, from approximately February 2018 through at least November 2018, Tyson, France, and five other codefendants conspired to make false statements to licensed firearms dealers when purchasing firearms. *(Id.)*. The indictment asserts that France and her codefendants unlawfully purchased firearms in the Northern District of Georgia for Tyson, and, when doing so, completed ATF forms on which they falsely attested that they were the actual buyers of the firearms when, in reality, they were purchasing the firearms for Tyson. (*Id.* at 2). Once France and her codefendants purchased the firearms, they gave them to Tyson. (*Id.* at 3). The remaining counts charged substantive firearms offenses as follows:

- Counts Two through Four, charged that, on September 1, 2018, September 10, 2018, and September 24, 2018, respectively, France and Tyson knowingly made false statements to licensed firearm dealers representing that France was the actual transferee and buyer of the firearms when, in fact, Tyson was, in violation of 18 U.S.C. § 922(a)(6) and 2.

- Counts Five through Eight, Count Eleven, and Count Thirteen charged that, on September 29, 2018, October 4, 2018, October 5, 2018, October 5, 2018, November 13, 2018, and November 14, 2018, respectively, Tyson and certain codefendants knowingly made false statements to licensed firearm dealers representing

2

that the codefendants were the actual transferees and buyers of the firearms when, in fact, Tyson was, in violation of 18 U.S.C. § 922(a)(6) and 2.

- Count Nine charged that, on October 7, 2018, Tyson and a codefendant knowingly caused Spirit Airlines to fail to file a Shipper's Export Declaration in that they failed to notify the company that the codefendant had unlawfully carried a firearm on board a flight, in violation of 13 U.S.C. § 305 and 18 U.S.C. § 2.

- Counts Ten and Twelve charged that, on November 10, 2018 and November 13, 2018, respectively, Tyson and France knowingly caused the United States Postal Service to fail to file a Shipper's Export Declaration in that they failed to declare that firearms and firearms parts were being exported in shipments from the United States to the U.S. Virgin Islands, in violation of 13 U.S.C. § 305 and 18 U.S.C. § 2.

- Count Fourteen charged that, on November 14, 2018, Tyson knowingly caused the United States Postal Service to fail to file a Shipper's Export Declaration in that he failed to declare that firearms and firearms parts were being exported in a shipment from the United States to the U.S. Virgin Islands, in violation of 13 U.S.C. § 305 and 18 U.S.C. § 2.

- Count Fifteen charged that, on November 14, 2018, Tyson unlawfully possessed a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

(Doc. 1).

France was arraigned on May 31, 2019. (Doc. 70). In October 2019, she filed a motion to suppress evidence seized from a warrantless border search of five packages mailed from the United States to the Virgin Islands (in which there were firearms and firearms parts), (docs. 121, 152, 153), and a motion to suppress data obtained from her cell phone, (doc. 135). On May 4, 2020, United States Magistrate Judge Alan J. Baverman recommended that France's motion to suppress the warrantless border search of the postal packages, (docs. 121, 152, 153), be denied. (Doc. 170). On June 4, 2020, the District Judge adopted Judge Baverman's Report and Recommendation and denied France's motion to suppress evidence seized from the warrantless border search. (Doc. 178). With respect to France's motion to suppress data obtained from her cell phone, (doc. 135), Judge Baverman noted that he would hold an evidentiary hearing on the matter. (Doc. 170). But, on March 4, 2021, after the District Judge denied France's motion to suppress the warrantless border search, and before Judge Baverman held an evidentiary hearing on France's motion to suppress data obtained from her cell phone, the parties alerted the Court that the case could be certified ready for trial. (Doc. 209). France's motion to suppress the cell phone search was thus deemed withdrawn, and the case certified. (*Id.*). Approximately eight months later, on November 1, 2021, France filed a motion seeking to de-certify the case against her so that she could proceed on a motion to dismiss Counts Ten and Twelve. (Doc. 265). The District Judge granted the motion to de-certify, (doc. 271), and remanded the case for the Magistrate Judge to rule on France's newly filed motion to dismiss counts, (doc. 266). Thus, the only motion now pending

4

before this Court with respect to France is her motion to dismiss counts, (doc. 266).

Tyson was arraigned on March 3, 2021. (Doc. 211). On August 12, 2021, he filed three motions: (1) a motion to dismiss Counts Ten, Twelve, and Fourteen, (doc. 251); (2) a motion to sever Count Fifteen, (doc. 253); and (3) a motion to suppress evidence seized from 41 Estate Caret Bay in the Virgin Islands, (doc. 252). On November 10, 2021, the Magistrate Judge held an evidentiary hearing on Tyson's motion to suppress evidence, (doc. 252). (Doc. 269). Subsequently, on November 24, 2021, Tyson filed a motion to adopt France's previously filed motion to suppress evidence seized from the warrantless border search, (doc. 277), and on December 28, 2021, the Magistrate Judge granted that motion. (Docs. 284, 285).

In sum, the following motions are presently before the Court and are addressed in this Report and Recommendation: (1) France and Tyson's motions to dismiss Counts Ten, Twelve, and Fourteen, (docs. 251, 266); (2) Tyson's motion to sever Count Fifteen, (doc. 253); (3) Tyson's motion to suppress evidence seized from 41 Estate Caret Bay, (doc. 252); and (4) Tyson's adopted motion to suppress the warrantless border search that was previously litigated by France. Each is discussed in turn below.

## FACTS

This case involves a parallel investigation conducted in the Northern District of Georgia and the District of the U.S. Virgin Islands where the defendants are alleged to have illegally purchased firearms in Georgia and transferred those firearms and firearms parts to the U.S. Virgin Islands. (*See* Doc. 1; Doc. 269 at 8).

A.  <u>**Tyson and France's Prosecution in the District of the Virgin Islands**</u>

On October 17, 2019, a federal grand jury sitting in the District of the Virgin Islands returned a ten-count indictment against both Tyson and France. (*See United States v. Shawn Tyson and Natasha Natile France*, D. VI., Docket 3:19-CR-00009-RAM-RM ("D. VI. Doc."). Specifically, the indictment charged both with violating 18 U.S.C. §§ 922, 924, and 1715 as follows:

- Count One charged that, on December 13, 2018, Tyson illegally possessed certain machine guns, in violation of 18 U.S.C. § 922(o) and 924(a)(2).

- Count Two charged that, on December 13, 2018, Tyson illegally possessed certain ammunition, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2).

- Counts Three and Four charged that, on November 10, 2018 and November 13, 2018, respectively, France, who is not a licensed firearms dealer, illegally transferred firearms to Tyson, also not a firearms dealer, knowing that Tyson did not reside in Georgia, in violation of 18 U.S.C. § 922(a)(5) and 924(a)(1)(D).

- Counts Five, Six, and Seven charged that, on November 10, 2018, November 13, 2018, and November 14, 2018, respectively, Tyson and France knowingly caused to be mailed firearms parts declared not mailable, in violation of 18 U.S.C. § 1715 and 2.

- Counts Eight, Nine, and Ten charged that, on November 10, 2018, November 13, 2018, and November 14, 2018, respectively, Tyson and France knowingly delivered to a contract carrier for transportation and shipment in commerce a package containing firearms without giving

6

written notice to the carrier that firearms were being transported, in

violation of 18 U.S.C. § 922(e) and 2.

(D. VI. Doc. at 96).

On December 17, 2019, France pleaded guilty to all of the counts against her — Counts Three through Ten. (*Id.* at 132). Tyson, however, proceeded to a jury trial. (*Id.* at 121-123, 129). At trial, Tyson did not dispute that the events happened, but argued that the government simply had the wrong person. (*Id.* at 138, 139, 152). After deliberating, a jury found Tyson not guilty on Counts One, Five, Six, Eight, Nine, and Ten, and guilty on Counts Two and Seven. (*Id.* at 130). On November 24, 2020, the district judge sentenced Tyson to 120 months' imprisonment, to be followed by three years' supervised release. (*Id.* at 186). That same day, France was sentenced to 41 months' imprisonment, to be followed by three years' supervised release. (*Id.*).

## B. Search of 41 Estate Caret Bay in the U.S. Virgin Islands

After the prosecution concluded in the District of the Virgin Islands, the prosecution began here in the Northern District of Georgia. (Doc. 1). Tyson filed several pretrial motions, and on November 10, 2021, the Magistrate Judge held an evidentiary hearing on Tyson's motion to suppress evidence seized from the search of 41 Estate Caret Bay. (Doc. 269). At that hearing, ATF Special Agent Dorman testified about evidence that law enforcement seized on December 13, 2018, when searching the residence. (Doc. 273 at 6). Agent Dorman explained that, after law enforcement swore out a complaint charging Tyson and France in the United States District Court in the Virgin Islands and obtained an arrest warrant, they attempted to locate and arrest Tyson. (*Id.* at 9). In that effort, they

"traveled to several different locations" in the U.S Virgin Islands, and, at one of those locations, interviewed a woman; based on what they learned from that interview, agents concluded that Tyson resided at 41 Estate Caret Bay. (*Id.* at 9). Agents went to the residence that day at approximately 4:30 or 5:00 p.m. and knocked on the front door. (*Id.* at 9, 17). Kareem McKenzie opened the door and came outside on the front porch. (*Id.* at 9, 34-35). While outside, Agent Dorman introduced himself as an ATF agent and explained to McKenzie that agents had an arrest warrant for Tyson and asked McKenzie if Tyson was at the house. (*Id.* at 35). McKenzie told the officers that he rented the house from Tyson, and explained that Tyson also resided there, but had not been at the house for a couple of days. (*Id.* at 9, 36). McKenzie further explained that he had rented the residence from Tyson since October of 2018, or, in other words, for about two months, and that he paid Tyson approximately $200 a month in rent to live there. (*Id.* at 9, 20). Agents asked McKenzie for his permission to enter the house to make sure that Tyson was not there, to which McKenzie responded affirmatively. (*Id.* at 10, 36). Agent Dorman described McKenzie as "cordial," and testified that no one coerced or threatened him in any way to get him to consent to a search. (*Id.* at 10).

Immediately after stepping inside, agents found themselves in the living room, and, directly off the living room, to the left, was a bedroom. (*Id.* at 11, 36). McKenzie explained that he used to live in that first bedroom, but that Tyson had "since moved in strippers," who now lived in that room, while McKenzie slept on the couch in the living room. (*Id.* at 11, 36). Through the living room was a kitchen, and off the kitchen area, to the left, was a bedroom with an open door

8

and, to the right, was a locked door that McKenzie explained was Tyson's bedroom. (*Id.* at 11). Agents did not try to access Tyson's locked bedroom but were able to see inside the other bedroom door that was open. (*Id.* at 11). When they looked into this room, they saw "a drill press, a work bench, and devices" that Agent Dorman "recognized to be firearms parts." (*Id.* at 11).

Agent Dorman testified that law enforcement entered the room "to clear it for humans, for bodies," and that, when doing so, "observed that the devices actually on the bench were Glock auto sears or auto sears with a Glock stamp on them."[1] (*Id.* at 11-12). Agent Dorman explained that this equipment was consistent with the bedroom operating as "a gun-making workshop." (*Id.* at 12). Agents also observed "fresh metal shavings on the equipment," which, Agent Dorman explained, were also indicative of gun making. (*Id.* at 12). He testified that he initially went into this bedroom "to see behind the door" in an effort to find Tyson, and that "it was at that time I looked and then I swung back around and my vision caught the auto sears." (*Id.* at 29).

During cross-examination, Agent Dorman admitted that he did not ask McKenzie if he had keys to the residence and further admitted that agents did not conduct surveillance at the residence to confirm that McKenzie did, in fact, live there. (*Id.* at 22, 24). Agent Dorman also explained that McKenzie told them that, in addition to 41 Estate Caret Bay, he stayed at other residences as well. (*Id.* at 22). Agent Dorman agreed with defense counsel that the couch "had a lot of clutter and stuff on top of it," and stated that items were "laying everywhere," all

---

[1] Agent Dorman explained that "[a]n auto sear is a device that causes a firearm from function [sic] semiautomatic to fully automatic and it's very distinct looking." (Doc. 273 at 33).

over the house, with "boxes stacked on things," and "tires and batteries" underneath the couch. (*Id.* at 23). In response to questions about McKenzie's driver's license, Agent Dorman testified that, at some point that day, he was shown a driver's license from Georgia. (*Id.* at 32).

## DISCUSSION

### A. France's and Tyson's Motions to Dismiss Counts

#### 1. Tyson's Motion to Dismiss Counts Ten, Twelve, and Fourteen Should Be Denied Because the Issue-Preclusion Doctrine Does Not Apply Here

Tyson argues that the issue-preclusion component of the Double Jeopardy Clause bars the Government from prosecuting him in the Northern District of Georgia for the allegations in Counts Ten, Twelve, and Fourteen. (Doc. 251 at 5). All three counts charge violations of 13 U.S.C. § 305. Specifically, Counts Ten and Twelve allege that on November 10, 2018 and November 13, 2018, respectively, in this District, Tyson and France knowingly caused the U.S. Postal Service ("USPS") to fail to file a Shipper's Export Declaration through the Automated Export System, in that they "failed to declare that firearms and firearms parts were to be exported in a shipment from the United States to the U.S. Virgin Islands." (Doc. 1 at 10, 11). Count Fourteen names only Tyson and alleges that on November 14, 2018, he knowingly caused the USPS to fail to file a Shipper's Export Declaration through the Automated Export System, in that he "failed to declare that firearms and firearms parts were to be exported in a shipment from the United States to the U.S. Virgin Islands," also in violation of 13 U.S.C. § 305.

10

(Doc. 1 at 12).[2]

Tyson was acquitted in the U.S. Virgin Islands of two counts charging violations of 18 U.S.C. § 1715 and three counts charging violations of 18 U.S.C. § 922(e) as follows:

- Count Five, charging him and France with mailing nonmailable material — that is, firearms and firearms parts— on November 10, 2018, in violation of 18 U.S.C. § 1715 and 2;

- Count Six, charging him and France with mailing nonmailable material — that is, firearms and firearms parts— on November 13, 2018, in violation of 18 U.S.C. § 1715 and 2;

- Count Eight, charging him and France with delivering a package containing firearms on November 10, 2018, to a common carrier for interstate and foreign commerce, without giving written notice to the carrier that firearms were being transported and shipped, in violation of 18 U.S.C. § 922(e) and 2;

- Count Nine, charging him and France with delivering a package containing firearms on November 13, 2018, to a common carrier for interstate and foreign commerce, without giving written notice to the carrier that firearms were being transported and shipped, in violation of 18 U.S.C. § 922(e) and 2; and

───────────────

[2] 15 C.F.R. 30.2 requires that any firearm exported from the U.S. Mainland to the U.S. Virgin Islands, by any mode of transportation, must be reported on an SED, which can be submitted electronically by filing electronic export information ("EEI"), through the Automated Export System. The government explains that the Automated Export System is an electronic portal that allows exporters to enter the required export information about any export. The Automated Export System is maintained by the U.S. Department of Commerce, through the U.S. Census Bureau and the U.S. Department of Homeland Security, Customs & Border Protection. (Doc. 303 at 6).

- Count Ten, charging him and France with delivering a package containing firearms on November 14, 2018, to a common carrier for interstate and foreign commerce, without giving written notice to the carrier that firearms were being transported and shipped, in violation of 18 U.S.C. § 922(e) and 2.

(*See* Doc. 251-1 at 5-6, 8-10).

Tyson contends that his acquittal on those five counts in the U.S. Virgin Islands necessarily shows that the jury decided that he did not deposit firearms and firearms parts for mailing through the USPS on November 10, 2018, November 13, 2018, and November 14, 2018; thus, he argues, the prosecution here on Counts Ten and Twelve — that is, the Northern District of Georgia charges alleging that Tyson and France, on November 10, 2018 and November 13, 2018, caused the USPS to fail to file an SED by failing to declare that firearms and firearms parts were being exported from the United States to the U.S. Virgin Islands — and the prosecution here on Count Fourteen — that is, the Northern District of Georgia charge alleging that Tyson, on November 14, 2018, caused the USPS to file to file an SED by failing to declare that firearms and firearms parts were being exported from the United States to the U.S. Virgin Islands — violate the Double Jeopardy Clause. (Doc. 251 at 9).

The Double Jeopardy Clause provides that "no person may be tried more than once for the same offense." U.S. Const., Amdt. 5. It "protects against a second prosecution for the same offense after conviction," and also "protects against a second prosecution for the same offense after acquittal." *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 357 (2016) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). "This guarantee recognizes the vast power of the sovereign, the ordeal of a criminal trial, and the injustice our criminal justice

12

system would invite if prosecutors could treat trials as dress rehearsals until they secure the convictions they seek." *Currier v. Virginia*, 138 S. Ct. 2144, 2149 (2018).

In *Ashe v. Swenson*, 397 U.S. 436 (1970), the Supreme Court held that the Double Jeopardy Clause includes a "collateral estoppel" or "issue preclusion" principle such that, when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 442. In other words, *Ashe* recognizes that the relitigation of an issue is sometimes tantamount to an impermissible relitigation of an offense. *See also Bravo-Fernandez*, 137 S. Ct. at 354 (recognizing that the "issue-preclusion component of the Double Jeopardy Clause bars a second contest of an issue of fact or law raised and necessarily resolved by a prior judgment.")(citing *Ashe*, 397 U.S. at 443). "The burden is on the defendant to demonstrate that the issue he seeks to shield from reconsideration was actually decided by a prior jury's verdict of acquittal." *Id.*

Issue-preclusion, though, is "predicated on the assumption that the jury acted rationally;" thus, "[w]hen a jury returns irreconcilably inconsistent verdicts . . . one can glean no more than that 'either in the acquittal or the conviction the jury did not speak their real conclusions.'" *Bravo-Fernandez*, 137 S. Ct. at 360 (quoting *United States v. Powell*, 469 U.S. 57, 64)). In *Bravo-Fernandez*, 137 S. Ct. at 354, the Supreme Court decided a case involving inconsistent verdicts. There, the jury convicted the defendant of bribery, but acquitted him of conspiracy to commit bribery and of traveling in interstate commerce to commit bribery. Because the only contested issue at trial was whether the defendant had committed bribery — and the issues of agreement and travel were undisputed—

13

"the jury's verdicts were irreconcilably inconsistent." *Id.* at 355. The Court held that, when the same jury returns irreconcilably inconsistent verdicts on the issue in question, a defendant cannot meet his burden of demonstrating that the issue he seeks to shield from reconsideration was actually decided by the jury. *Id.* at 354. Simply put, issue preclusion does not apply where the jury reached inconsistent verdicts. Such is the case here.

Tyson 's sole defense in the Virgin Islands was that he was not involved in the charged transactions; in other words, his defense was that the government had the wrong person. To prove that defense, his counsel argued that the government had misidentified him as the perpetrator, cross-examined each witness on the theory that Tyson was not involved in the mailing or receiving of the parcels, and emphasized that the government had no forensic evidence (such as fingerprints, DNA, or surveillance) tying him to the crime. (*Id.* at 9-10). But even though his defense was the same for all of the charges against him, the Virgin Islands jury found that Tyson was guilty of mailing a nonmailable firearm on November 14, 2018, in violation of 18 U.S.C. § 1715 (Count Seven), and, at the same time, acquitted him of delivering firearms on November 14, 2018, to a common carrier without written notice that the package contained firearms (Count Ten). (D. VI. at Doc. 130). Given that Tyson's sole defense was misidentification, the Count Seven conviction and Count Ten acquittal are inconsistent. Thus, under the holding of *Bravo-Fernandez*, the government is not barred from prosecuting Tyson here for the Count Fourteen allegation addressing conduct on November 14, 2018.

The Court finds that the Virgin Islands jury's inconsistent verdict also allows the government to proceed against Tyson on Counts Ten and Twelve (the allegations involving November 10, 2018, and November 13, 2018). Because the sole defense for *all* counts was misidentification, the jury's inconsistent verdicts addressing the November 14, 2018, offense also affect the November 10 and 13 offenses. In making this finding, this Court is mindful of the Supreme Court's 2018, reaffirmation of its earlier warning enunciated in 2016 in *Bravo-Fernandez* that "issue preclusion principles should have only guarded application in criminal cases." *Currier*, 138 S. Ct. at 2152 (quoting *Bravo-Fernandez*, 137 S. Ct. at 358). The *Currier* Court also emphasized that a "second trial is not precluded simply because it is unlikely – or even very unlikely – that the original jury acquitted without finding the fact in question." *Id.* at 2146. Instead, "[w]e must be able to say that 'it would have been irrational for the jury in the first trial to acquit without finding in the defendant's favor on a fact essential to a conviction in the second." *Id.* at 2150; *see also United States v. Gil*, 142 F.3d 1398, 1401-02 (11th Cir. 1998)("We will not speculate regarding the meaning of the jury's verdict . . . as the government is only estopped from introducing issues that were "necessarily determined in a former trial.").

I thus recommend that Tyson's motion to dismiss counts be denied because the jury's previous inconsistent verdicts mean that the issue-preclusion rule is not applicable here. In addition, as explained below, the Double Jeopardy Clause does not bar prosecution here because the NDGA counts charge different statutory elements than were charged in the Virgin Islands.

**2. Tyson's and France's Motion to Dismiss Counts Ten, Twelve, and Fourteen Should Be Denied Because Each Count Charges Offenses that Require Additional Elements Than the Charges Prosecuted in <u>the U.S. Virgin Islands</u>**

France argues that the Court should dismiss Counts Ten and Twelve against her as violating the Double Jeopardy Clause because she has already pleaded guilty to the same facts and legal elements in the Virgin Islands. (Doc. 266 at 2-3). Specifically, France argues that because the Georgia prosecution charges her with offenses containing the "same elements" as those offenses to which she pleaded guilty in the Virgin Islands, any prosecution here places her in double jeopardy. (Doc. 266 at 2-3)(citing *Blockburger v. United States*, 284 U.S. 299 (1932)).

The "same elements test" that France invokes was established by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299 (1932), and "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution." (Doc. 266 at 3)(quoting *United States v. Dixon*, 509 U.S. 688, 696 (1993)). "To prevent a second trial on a new charge, the defendant must show an identity of *statutory elements* between the two charges against him; it's not enough that 'a substantial overlap [exists] in the proof offered to establish the crimes.'" *Currier*, 138 S. Ct. at 2153 (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1075)(emphasis added)).

As explained above, France previously pleaded guilty to violations under 18 U.S.C. §§ 922(a)(5), 922(e), 924(a)(1)(D), and 1715. Here, she (and Tyson) are charged with violating 18 U.S.C. §922(a)(6) and 13 U.S.C. § 305. The elements for each of these offenses is as follows:

| Convictions in the Virgin Islands | Charges in NDGA |
|---|---|
| **18 U.S.C. § 922(a)(5) & § 924(a)(1)(D)**<br><br>• To, as an unlicensed person,<br>• Willfully transfer, transport, or deliver<br>• Any firearm<br>• To anyone who is not licensed and who the transferor knows (or has reason to believe) does not reside in the State in which the transferor resides. | **13 U.S.C. § 305**<br><br>• To knowingly fail to file (or to submit false or misleading) export information<br>• Through the Shippers Export Declaration (or the Automated Export System). |
| **18 U.S.C. § 922(e)**<br><br>• To knowingly<br>• Deliver (or cause to be delivered)<br>• To any common or contract carrier tor transportation or shipment in interstate or foreign commerce<br>• Any package in which there is a firearm<br>• And the package is to be delivered to someone who is not a licensed firearms dealer<br>• Without providing written notice to the carrier that a firearm is inside the package. | **18 U.S.C. § 922(a)(6)**<br><br>• To, when acquiring a firearm, knowingly make a false written statement<br>• Intending to deceive the firearms dealer<br>• Regarding a material fact as to the lawfulness of the firearm sale. |
| **18 U.S.C. § 1715**<br><br>• To knowingly<br>• Deposit for mailing (or cause to be mailed)<br>• A firearm declared nonmailable | |

As the government notes, "[i]f each offense requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." (Doc. 303 at 4)(quoting *United States v. Phillips*, 664 F.2d 971, 1006 (5th Cir. Unit B 1981)). Here, § 305 and § 922(a)(6) each contain at least one element that is not contained in any of the other charges: § 305 requires knowingly failing to file (or submitting false or misleading export information) through the Shippers Export Declaration (or the Automated Export System), and § 922(a)(6) requires that someone purchases a firearm and does so with an intent to deceive a licensed firearms dealer. Thus, the parties' motion to dismiss counts should be denied because the offenses charged in this NDGA prosecution involve different legal elements (and thus require additional proofs of fact) than the offenses charged in the District of the Virgin Islands.

### 3. France's Motion to Dismiss Counts Ten and Twelve Should Be Denied Because the Indictment Provides Adequate Notice of the <u>Charges Against Her</u>.

France also argues that "[m]ailing a shipment from the State of Georgia of the United States to the Territory of the Virgin Islands," as she is alleged to have done here, "is not an export *out of* the United States," and thus the alleged conduct cannot support the charge against her. (Doc. 266 at 5)(emphasis added)(citing 15 C.F.R. Part 734.13 that defines an "export" as an "actual shipment or transmission out of the United States, including the sending or taking of an item, out of the United States in any manner."). France explains that 13 U.S.C. 305 is a regulatory offense requiring individuals to file forms so that the government may keep track of imports and exports, and, in doing so, "promote,

develop, and further commerce for the United States." (Doc. 266 at 5). Thus, argues France, charging this "regulatory offense" constitutes "a defect in this criminal indictment as it does not put Ms. France on notice of the essential elements of export activities." (Doc. 266 at 5-6). Instead, France argues, the "indictment only puts [her] on notice of substantive criminal offenses involving firearms (chapter 44 of title 18) and conspiracy." (Doc. 266 at 6).

In response, the government argues that Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." In this Circuit, an indictment is legally sufficient when it: (1) presents the essential elements of the charged offense; (2) notifies the accused of the charges to be defended against; and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution. *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002). "The constitutional standard is met by an indictment that tracks the wording of the statute, as long as the language sets forth the essential elements of the crime." *United States v. Critzer*, 951 F.2d 306, 308 (11th Cir. 1992)). The indictment does this here.

Counts Ten and Twelve track the language of 13 U.S.C. § 305 precisely. The Counts also provide additional, specific detail beyond the statutory language describing the alleged offenses. Title 13 U.S.C. § 305 provides in relevant part as follows:

> Any person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES) shall be subject to a fine not

19

> to exceed $10,000 per violation or imprisonment for not more
> than 5 years, or both.

Count Ten in the indictment reads:

> On or about November 10, 2018, within the Northern District of
> Georgia, the defendants, SHAWN TYSON and NATASHA
> NATILE FRANCE, aided and abetted by each other, did
> knowingly cause the U.S. Postal Service to fail to file a Shipper's
> Export Declaration through the Automated Export System, in that
> the defendants, SHAWN TYSON and NATASHA NATILE
> FRANCE, failed to declare that firearms and firearms parts were
> to be exported in a shipment from the United States to the U.S.
> Virgin Islands, in violation of Title 13, United States Code, Section
> 305, and Title 18, United States Code, Section 2.

(Doc. 1 at 10). And Count Twelve reads:

> On or about November 13, 2018, within the Northern District of
> Georgia, the defendants, SHAWN TYSON and NATASHA
> NATILE FRANCE, aided and abetted by each other, did
> knowingly cause the U.S. Postal Service to fail to file a Shipper's
> Export Declaration through the Automated Export System, in that
> the defendants, SHAWN TYSON and NATASHA NATILE
> FRANCE, failed to declare that firearms and firearms parts were
> to be exported in a shipment from the United States to the U.S.
> Virgin Islands, in violation of Title 13, United States Code, Section
> 305, and Title 18, United States Code, Section 2.

(Doc. 1 at 11). Thus, I find that the indictment provides adequate notice, and I

recommend that France's motion to dismiss counts be denied.

## B. Tyson's Motion to Sever Count Fifteen

Count Fifteen charges Tyson with possessing a firearm as a convicted

felon. (Doc. 1). Specifically, the indictment charges that Tyson, "having been

previously convicted of a felony offense, that is, a crime punishable by

imprisonment for a term exceeding one year, did knowingly possess a firearm in

and affecting interstate and foreign commerce, that is, one (1) CZ, model 805

20

Bren, 5.56 caliber pistol." (*Id.*). He is the only one named in this count. He asserts that, "[i]ntroduction of evidence in support of Count 15 would be highly prejudicial" and thus severance is warranted. (*Id.* at 2). The government argues that Tyson has failed to show the requisite "compelling prejudice" to justify a severance. (Doc. 302). In reply, Tyson asserts that, as the sole defendant in a multi-defendant indictment charged with the illegal firearm possession offense, he "will stand out, in contrast to his co-defendants, as a person of bad character as he has a prior felony conviction." (Doc. 305 at 1).

Federal Rule of Criminal Procedure 8(a) provides that an indictment may charge a defendant in separate counts with two or more offenses if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a*); see also United States v. Dominguez*, 226 F.3d 1235, 1238 (11th Cir. 2000). Defining the outer limits of what counts an indictment may join, Rule 8 is broadly construed in favor of joinder because of the efficiency of trying the defendant on related counts in the same trial. *See id. a*t 1238; *see also United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003); *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000). Tyson does not argue that Count Fifteen was improperly joined in the indictment.

Even when an indictment has properly joined two or more counts under Rule 8, a court, in its discretion, may sever the offenses under Federal Rule of Criminal Procedure 14, where joinder of offenses in an indictment appears to prejudice a defendant. Fed. R. Crim. P. 14(a); *United States v. Buchanon*, 930 F. Supp. 657, 667 (D. Mass. 1996). The Supreme Court, however, has admonished

that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, (1993); *see also United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005). Accordingly, a defendant must demonstrate that absent severance, a joint trial will result in a miscarriage of justice. *See United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988). Tyson has failed to meet that heavy burden here.

To begin, Tyson has made only a generalized claim of possible prejudice from the joinder of counts. This generalized claim is insufficient to show that there is an actual, serious risk that a joint trial would prevent the jury from making a reliable judgment about Tyson's guilt or innocence. *See United States v. Walser*, 3 F.3d 380, 386 (11th Cir. 1993)("To justify reversal more than some prejudice must be shown; the [defendant] must demonstrate that he received an unfair trial and suffered compelling prejudice. This is a heavy burden, and one which mere conclusory allegations cannot carry.'"); *United States v. Hagins*, 452 F. App'x 141, 146 (3rd Cir. 2011)(affirming district court's denial of motion to sever felon-in-possession charge from straw purchase conspiracy charges where defendant pointed to no specific evidence showing prejudice).

Moreover, at the time of trial, the parties can stipulate to the fact that Tyson has previously been convicted of a felony offense, which would reduce the prejudice to him. *See United States v. Miller*, 225 F.3d 1282, 1289 (11th Cir. 2001)(affirming the district court's denial of the defendant's motion to sever the felon-in-possession count from the other counts because any prejudice was mitigated by the fact that the defendant stipulated to his prior conviction and his

general allegations of prejudice was insufficient to meet his heavy burden of demonstrating specific and compelling prejudice). In addition, the felon-in-possession charge can hardly be said to portray Tyson as a more dangerous individual than the firearms offenses levied against him in the other counts. *See United States v. Hersh*, 297 F.3d 1233, 1243 (11th Cir. 2002)(rejecting the defendant's severance argument in part because a reasonable jury undoubtedly would have found that all counts were equally inflammatory and because the defendant offered no support for his contention that the evidence of the felon-in-possession count was somehow more prejudicial or inflammatory than the other counts).

Most importantly, though, the district court will instruct the jury to consider each charge in the indictment separately and not to allow a verdict on one count to affect deliberations on another. This Circuit presumes that juries are able to follow a district court's instructions, and because any possible prejudice may be cured by a cautionary instruction, severance is not required. *See United States v. Zitron*, 810 F.3d 1253, 1258 (11th Cir. 2016)(finding that a jury instruction requiring the jury to consider the evidence relating to each count separately and that a finding of guilty as to one count must not influence its verdict as to any other count cures any prejudice from trying counts together); *Walser*, 3 F.3d at 387.

Because Rule 14 of the Federal Rules of Criminal Procedure requires a compelling, specific, or actual allegation of prejudice to justify severing a count from an indictment, and because Tyson has failed to show that the joinder of

these counts will prejudice him at trial, I conclude that the expense and inconvenience of separate trials outweighs any possible prejudice.

### C. **Tyson's Motion to Suppress Evidence Seized from 41 Estate Caret Bay**

Tyson has moved to suppress the evidence seized from 41 Estate Caret Bay. Specifically, he asserts that McKenzie did not have authority to let officers into his home and did not have authority to consent to a search. (Doc. 252 at 2). According to Tyson, because law enforcement saw "a drill press and what appeared to be a Glock firearm part, as well as metal shavings" inside the house, and used the information they learned "by way of the illegal entry" when applying for, and obtaining, the premises search warrant, all evidence seized from the search of 41 Estate Caret Bay should be suppressed. (*Id.* at 3). The government, on the other hand, argues that law enforcement reasonably believed that McKenzie had authority to consent to a warrantless entry into the house, and thus the evidence from the premises search was lawfully seized. (Doc. 278 at 4-5).[3]

Under the Fourth Amendment, a warrantless search is per se unreasonable unless it falls within one of the carefully delineated exceptions. One such exception exists when officers obtain a valid consent to search. In *United States v. Matlock*, 415 U.S. 164, 171-72 (1974), the Supreme Court recognized that a consent

---

[3] In its post-hearing brief, the government recognized that *Payton v. New York*, 445 U.S. 573 (1980), held that agents, armed with an arrest warrant, may enter a suspect's dwelling if there's a reason to believe that the suspect is inside, but conceded that, here, "law enforcement did not know where the Defendant was at the time they approached the residence." (*Id.* at 4-5). Thus, the government states that this Court's analysis must focus on "whether law enforcement obtained voluntary consent to enter the residence." (*Id.* at 5).

to search can be given by a third party, and held that officers may obtain consent to search from a third party if the consent is voluntary[4] and the third party possesses "common authority over" the premises sought to be searched. "'Common authority' rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Common authority may be either actual or apparent. *Id.* at 185-189.

Here, the government contends that McKenzie had apparent authority to consent to law enforcement entering the house. In determining whether apparent authority exists, such consent must be judged against an objective standard: "would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188 (citation and internal quotation marks omitted).

This Court finds that the facts available to officers when they spoke to McKenzie on the front porch warranted their belief that McKenzie had authority to consent to officers entering the home. When officers knocked on the front door, it was McKenzie who answered. Agent Dorman then questioned McKenzie about his relationship to Tyson and to 41 Estate Caret Bay. McKenzie explained that Tyson owned the house, but that he was not there at the moment and further explained that Tyson had not been there for a couple of days. As for his own presence, McKenzie explained that he rented the house from Tyson, that he had done so for two months, and that he paid $200 a month to live there.

---

[4] Tyson does not argue that McKenzie's consent was involuntary; consequently, the Court does not address this prong of the consent test.

25

When McKenzie let the officers into the house, he continued to provide information that would warrant a man of reasonable caution to believe that McKenzie had the authority to consent to the officers' presence. McKenzie told law enforcement that the first room was occupied by women, providing a history of sorts when he explained that he used to sleep in that room until Tyson invited women into the house. Now, he explained, he sleeps on the couch. He pointed out Tyson's room as well, which was located off of the kitchen and was locked.

Tyson, in an effort to discredit McKenzie, points out to statements showing that "he was a transient visitor" who "had other residences," and that the couch where McKenzie purportedly slept was "buried underneath things." (*Id.* at 8). It is true that "[e]ven when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Rodriguez*, 497 U.S. at 188. But, as the Eighth Circuit noted in *United States v. Almeida-Perez*, 549 F.3d 1162 (8th Cir. 2008), "the police cannot rely on the assumption that the people in the household hew to conventional arrangements when atypical 'specialized tenancy arrangements' should be apparent from what they see and hear." 549 F.3d at 1171 (quoting *Georgia v. Randolph*, 547 U.S. 103, 110 (2006)). Certainly, here, it was not unreasonable for the officers to conclude that what they were seeing at 41 Estate Caret Bay was not a typical living situation.

Next, Tyson argues that, assuming that McKenzie did have apparent authority to consent to the initial search, the scope of that authority was limited to the space to which he had access. (*Id.* at 9). The Court finds that the scope of

26

McKenzie's authority extended to the room where he slept — the living room—
as well as the kitchen, which constitutes a common area of the home. But
whether McKenzie had apparent authority to consent to a search of the bedroom
in which officers discovered the "gun-making workshop," however, is a close
question.[5] And unlike the initial inquiries officers made on the front porch when
they first encountered McKenzie, the record does not show that law enforcement
inquired further as to McKenzie's access to, and use of, the third bedroom. If the
circumstances are unclear as to whether the person giving consent has mutual
use over the property, agents must conduct further inquiry into the matter. *See
Rodriguez*, 497 U.S. at 188-89 (where the circumstances presented would cause a
person of reasonable caution to question whether the third party has mutual use
of the property, "warrantless entry without further inquiry is unlawful."); *see
also, e.g., United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004)("[W]here an
officer is presented with ambiguous facts related to authority, he or she has a
duty to investigate further before relying on consent."); *United States v. Rosario*,
962 F.2d 733, 738 (7th Cir. 1992)(in the absence of sufficient facts, officers have a

_____

[5] Certainly, if Agent Dorman saw the incriminating evidence in the third
bedroom while he stood in the common area of the kitchen, then the plain view
doctrine would apply. The record, however, is not clear on this point, and the
government failed to flesh out the issue. From the record as it stands, the Court
concludes that Agent Dorman did not see the incriminating evidence included in
the search warrant until he was already inside of the third bedroom. Agent
Dorman testified that he initially went into this bedroom "to see behind the
door . . . And it was at that time I looked and then I swung back around and my
vision caught the auto sears, and that's when I told everybody, hey, firearm parts
here." (Doc. 273 at 29).  Thus, the relevant question in the Court's analysis is
whether McKenzie had apparent authority to consent to Agent Dorman entering
the third bedroom.

duty to seek further information in order to determine whether they may reasonably infer that the inviter has the authority to consent to an entry or search of the premises); *United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991)(government's burden to prove consent "cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry").

It certainly would have been better for law enforcement to have asked McKenzie whether he was allowed access to the bedroom in which they discovered the incriminating evidence. This Court concludes, though, that it was not objectively unreasonable for officers to believe that McKenzie had authority to consent to a search of the third bedroom because (and only because) Tyson's bedroom was locked. The fact that Tyson locked his bedroom supports the conclusion that Tyson knew, and assumed the risk, that others would access any unlocked rooms. *See Matlock,* 415 U.S. at 171, n.7 (explaining that "common authority" does not rest on property law; instead, "common authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any one of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."); *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir. 1990)(recognizing that the authority of a third person to consent to a search "stems from a practical understanding of the way in which the parties to a given relationship have access to and share certain property."); *United States v. Son*, No. 1:12-CR-42-ODE-JFK, 2012 WL 4711978 (N.D. Ga. Oct. 2, 2012)(finding third-party consent valid where the door to the room was not locked and the items

seized were not in any type of locked container). *United States v. Pagan-Torres*, No. 3:10-CR-00006-TCB-GGB, 2010 WL 5087860 (N.D. Ga. Nov. 16, 2010)(recognizing that "[t]here are situations in which persons who share a residence may retain areas or items of exclusive control to which their co-occupants may not effectively grant consent to search," such as when an item is locked, which was not the case there). *Cf. Acosta*, 807 F. Supp.2d at 1207 (finding no apparent authority to consent to a search where the room was locked and the third-party did not have a key).

The government claims that Agent Dorman was conducting a lawful protective sweep when he saw, in plain view, the incriminating evidence. A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," and is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 324, 327 (1990). The *Buie* Court identified two types of protective sweeps. First, incident to an in-home arrest, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. Second, a more extensive search is permitted if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*.

While *Buie* addressed officers' actions when arresting a defendant, the facts here have officers inside the house only by way of third-party consent. The

Eleventh Circuit, however, has applied *Buie* to a consent context. *See United States v. Legette*, 260 F. App'x 247, 248 (11th Cir. 2008); *see also United States v. Cordova*, 758 F. Supp.2d 1367, 1375-77 (N.D. Ga. 2010)(surveying post-*Buie* decisions and finding that protective sweeps "are permissible where officers are present in a home with the consent of an occupant"). But, as one judge in this District has found, "*Buie* sweeps are allowed, if at all, only in accordance with *Buie's* terms. That is, a protective sweep beyond the immediate area is allowed only if there are articulable facts and inferences from them that someone in another area of the home presents a danger to officers in the house." *Cordova*, 758 F. Supp.2d at 1377.

Here, the government proffered no reasons that would lead a reasonable person to believe that another person was inside the house, posing a danger to the officers. It does not appear that officers conducted any pre-knock and talk surveillance to support a belief that anyone other than McKenzie was home, nor does it appear that, once officers were inside the home, anything happened to cause them to believe that someone was inside and posed a danger. Instead, McKenzie affirmatively told officers that Tyson was not at the house, and nothing in the record suggests that McKenzie stated that anyone was home except for him. The investigating officers' lack of information about whether anyone inside the house posed any danger cannot be used to justify a protective sweep. *See United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999)("[I]n the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this case."); *Cf. United*

*States v. Yarbrough,* 961 F.3d 1157 (11th Cir. 2020)(protective sweep lawful where "numerous anonymous tips suggested that the house was heavily trafficked and a source of possible drug activity," "the presence of two vehicles sat at the residence suggested that multiple people could be present" inside; and officers were personally aware that others were present and saw a woman flee to an area inside); *United States v. Hollis*, 780 F.3d 1064 (11th Cir. 2015)(protective sweep was lawful because the government established articulable facts that warranted a reasonably prudent officer in believing that the area to be swept harbored an individual posing a danger given that officers had been told that the house was a "drug house" with a "high level activity" where "people [were] in and out of the house all hours of the day and night" and that "they could expect to encounter a number of people inside."); *United States v. Yeary*, 740 F.3d 569 (11th Cir. 2014)(protective sweep lawful where defendant told officers that others were inside the home); *United States v. Lesane*, 685 F. App'x 705 (11th Cir. 2017)(protective sweep was valid where officers saw someone else inside the home who "manipulated the blinds" in an area of the home separate from where the defendant emerged).

Thus, this Court concludes that the government cannot rely on the protective sweep doctrine to support their discovery of the incriminating evidence inside the third bedroom. The government's argument, therefore, rises and falls with McKenzie's consent to search. And while this case presents a very close question as to whether a reasonable person could, without further inquiry, conclude that McKenzie had apparent authority to consent to a search of the third bedroom, I ultimately conclude that he did.

**D. Tyson's Adopted Motion to Suppress Evidence Seized from the Border Search**

In October 2018, Custom and Border Patrol ("CBP") officers in St. Thomas, Virgin Islands discovered various internal mail packages coming into the U.S. Virgin Islands from Atlanta, Georgia, addressed to Tyson and containing a return address for France in Austell, Georgia. (Doc. 170 at 3-5; Doc. 285 at 1). When officers opened these packages, they found firearms and firearms parts. (*See* Doc. 170 at 3-5). After France was indicted in the Northern District of Georgia, she filed a motion to suppress the warrantless border search of five such packages. (Docs. 121, 152, 153). The Magistrate Judge recommended that France's motion to suppress be denied, recognizing the border search exception to the Fourth Amendment — that is, that warrantless searches conducted at the international borders of the United States do not violate the Fourth Amendment — and finding no reason why this doctrine should not apply to packages mailed from the continental United States to one of its possessions or territories. (Doc. 170 at 11, 13). The Magistrate Judge further found that the good faith exception to the exclusionary rule also applied because officers acted "on the basis of a regulation that permitted the warrantless opening of priority mail delivered from the continental United States to the Virgin Islands." (Doc. 170). The District Judge adopted the Magistrate Judge's Report and Recommendation and denied France's motion to suppress the evidence seized at the border. (Doc.178 at 6).

Tyson has moved to adopt France's motion to suppress, but only to preserve the issue for appeal if necessary. At the November 8, 2021, evidentiary hearing, Tyson's attorney explained that she recognized that the Court had already ruled on France's motion to suppress, but that she would "like the

opportunity for leave of court" to file the same motion so as "to preserve the issue for Mr. Tyson." (*Id.* at 41). When the government objected to Tyson doing so, arguing preclusion, the Court explained that Tyson's attorney was trying to simply adopt France's motion and "to live with that ruling," so that, should Tyson lose at trial, he could still appeal the ruling. (*Id.*). Judge Baverman explained: "I would not be willing to re-open and re-litigation because the facts are already established," but because Tyson wanted only to preserve the issue for appeal purposes later, the Court "wouldn't get too bent out of shape allowing Mr. Tyson to adopt Ms. France's motion." (*Id.*). After the Court's explanation, the government withdrew its objection. (*Id.*).

Thus, Tyson does not seek to relitigate the issues from France's motion to suppress, and the Court thus incorporates the previous Report and Recommendation. (*See* Doc. 107). Tyson's motion to dismiss should, as Tyson himself recognizes, be denied for the same reasons as France's motion was denied.

## CONCLUSION

For the reasons explained above, it is **RECOMMENDED** that Tyson's motion to dismiss Counts Ten, Twelve, and Fourteen, (doc. 251); motion to sever Count Fifteen, (doc. 253); motion to suppress evidence, (doc. 252); and adopted motion to suppress evidence filed by France, (doc. 285), be **DENIED**. It is **FURTHER RECOMMENDED** that France's motion to dismiss Counts Ten and Twelve, (doc. 266), be **DENIED**.

There are no pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case. **IT IS**

**THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

      **IT IS SO ORDERED** and **RECOMMENDED**, this 24th day of June, 2022.

_____
J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE